CATHEDRAL ESTATES, Inc., Irving Zauderer, Allenhurst Realties, Inc., Robert Linker, Lillian Linker, Helen Kimmelman, Frances Zauderer, Anna Haberman, Charles Kimmelman and Milton A. Kimmelman, copartners doing business under the firm name and style of Charles and Milton A. Kimmelman individually and as holders of Voting Trust Certificates representing stock of The Taft Realty Corporation, suing on behalf of themselves and all other holders of Voting Trust Certificates of The Taft Realty Corporation, and for the benefit of said corporation, Plaintiffs,

v.

The TAFT REALTY CORPORATION, Hotel Taft, Inc.; Samuel L. Lebis, William L. Hadden and G. Harold Welch, as Voting Trustees of the stock of The Taft Realty Corporation; and Samuel L. Lebis and Ruth Lebis individually, Defendants.

Civ. A. 3016.

United States District Court
D. Connecticut.

Sept. 21, 1954.

On Motion For New Trial, etc.,
Nov. 17, 1954.

On Motion For Judgment
March 22, 1957.

Pullman, Comley, Bradley & Reeves, Bridgeport, Conn. (William Reeves, John S. Barton, Bridgeport, Conn., of counsel),

Sylvester & Harris, New York City (Sidney G. Kingsley, New York City, of counsel), for plaintiffs.

Hugh Meade Alcorn, Jr., R. Graeme Smith, Henry P. Bakewell, Hartford, Conn., for defendants.

J. JOSEPH SMITH, Chief Judge.

This is a stockholders derivative action seeking to set aside the sale and conveyance of the Hotel Taft in New Haven, and seeking to obtain transfer to the old hotel corporation of shares of its stock claimed to have been purchased in usurpation of its corporate opportunity to purchase them, and for an accounting.

The principal issues on the first count are the value of the hotel property on the date of sale, January 20, 1950, the fairness of the consideration actually paid, the effect of the sale on the seller corporation and the necessity of the sale.

There is no question but that the sale was by a corporation 92% owned and dominated by Mr. Lebis an experienced hotel operator, and Mrs. Lebis, to a corporation 100% owned by them, formed for the purpose of making the purchase.

Defendants contend that the only issues on the first count are value and good faith, that any other issues are outside the pleadings and a surprise to them. The Court cannot construe the pleadings so narrowly, however. The principal claim of plaintiffs was gross inadequacy of price, but from the early dependence on Klopot v. Northrup, 131 Conn. 14, 37 A.2d 700, it has been plain that plaintiffs were contending that the effect on the corporation of the sale threw the burden on defendants of justifying it in every respect.

On the first issue, value of the property sold on the date of sale, the evidence on neither side is as full and persuasive as one could wish. No complete study and appraisal of the assets sold, related to the financial history of the property was made by the expert witnesses for either side. Plaintiffs' witnesses, True and MacRossie, built a structure of assumptions giving plausibility to their final figures of $1,400,000 and $1,450,000, borne out to a large extent by the hindsight of the experience in the years immediately following the sale. The assumptions, however, were demonstrated on cross examination to vary in so many respects from reality as to deprive the final figures of any basis in facts available to a willing buyer and willing seller at the date of sale.

The post sale period was greatly affected by the Korean War inflation, which could not have been foreseen at the time of sale.

The evidence of True must in any case be disregarded in view of his deliberate falsification of testimony bearing on his qualifications, and that of MacRossie is somewhat tainted by the exaggeration in the same field.

The three men from whom the defendant Lebis obtained estimates of the value of the property in 1949 gave what were little better than shoestring opinions without complete appraisal study of the building and equipment or any very detailed analysis of the financial history. They did have enough available to give a rough opinion, however, and were well qualified in their fields. If their opinions were honestly given under the impression that they were to assist Lebis in financing, there is no reason to believe that they were intentionally on the low side. They are therefore entitled to some weight particularly in view of their able defense on trial of the figures in the light of the financial history of the hotel before the sale. Mahoney's opinion also, bolstered as to ratio by the Bond sale, which, while not demonstrated to be closely comparable was probably the sale most nearly so, is of some weight. On the whole evidence we conclude that defendants have borne the burden of establishing a value of the hotel proper with its equipment and furnishings at $815,000, the value at which it was carried on the books of the corporation.

The purchase price was stated as $815,-000, of which $500,000 was the proceeds of a new first mortgage on the property conveyed, the balance $315,000 by a note payable over a period of 23 years with interest at 4%, secured by a second mortgage. Cash on hand of $12,500 and in-

ventories of food, beverages and the like were paid for by a series of notes. The fair market value of the purchase money note and second mortgage of a face amount of $315,000, with the interest and maturity of the note in question at the date of sale was $142,500. The value received by the corporation selling the hotel was therefore $642,500. The market value of the hotel, $815,000, was grossly in excess of the value received.

When the hotel proper was severed from the other property of the corporation, the old corporation was left with the Annex, a building a few years younger than the hotel proper, containing a theater, three stores, and about 110 rentable rooms. A small entrance and elevator existed in the building, used primarily by permanent guests in the first two floors of rooms. The transient rooms in the floors above were reached ordinarily from the corresponding floors of the hotel proper through hallways crossing the alley between the two buildings on a bridge structure. The Annex had no public rooms or office or administrative space aside from a very small lobby and desk, was heated from the hotel and managed with the hotel by a Lebis corporation both before and after the sale. It was not suitable for separate operation without extensive remodeling. Its market value was substantially reduced by the separation and sale. By means of the sale, the selling corporation lost all opportunity to benefit by any improvement in business of the hotel, but was subject to the probability of loss if the purchasing corporation, with a paid in capital of only $10,000, should be unsuccessful. The minority certificate holders in the selling corporation were given no opportunity to acquire stock in the new corporation in proportion to their holdings in the old. After protest by the plaintiffs the defendants offered to have a new appraisal made and adjust the sale price or purchase plaintiffs' shares on the basis of the new appraisal. Defendants sought to show demand by plaintiffs for unconscionable prices for their certificates under threat of suit, but this evidence was ruled out on the ground that motive of plaintiffs in a representative stockholder's suit is immaterial.

Possibly statutory provision should be made whereby very small corporate minorities could be bought out at a fair price fixed by appraisal, arbitration or court finding, so that shakedown or strike suits could be avoided, and potentially troublesome small shareholders could be properly compensated for their holdings and the majority enabled thereby to remove the present handicap to free exercise of judgment in management. Connecticut has not chosen such a course, however, and has preferred to continue to impose the strict obligations of fiduciaries upon corporate majorities in dealings between themselves and their corporations. A corporate majority may not, in the absence of express statutory authority, force a minority to sell, regardless of the fairness of the price offered. Nor may a majority sell to itself the principal assets of a corporation, effectively putting it out of the business for which it was formed, in order to get rid of a minority. Where this is the effect of a sale, as in this case, the defendants have a heavy burden of showing the necessity of the move from the standpoint of the corporation. They have fallen far short of such a showing here. They have shown only that a large refinancing was necessary when the bonds came due, and that the defendants made some effort to obtain a new mortgage sufficient to refinance all of the bonds, that they did not do so, and that they thereupon furnished the means used to refinance, separating the property and transferring the hotel to themselves in the process. Defendants knew that plaintiffs had invested substantial sums in bonds of the corporation. Although early in the year before the sale the formation of the new corporation to acquire the hotel was undertaken, no notice was given to or assistance sought from plaintiffs or anyone else to refinance through the old corporation, or opportunity given to the investors in the old to participate in the new. We must conclude that the defendants have failed to sustain the heavy burden, placed on them by their fiduciary capacity as the major-

ity interest in the corporation, of showing the entire fairness and corporate necessity of the transfer to themselves of the major asset of the corporation. The transfer must therefore be set aside and an accounting had of the purchaser's profits resulting from the transfer.

■ The second count seeks to require Mrs. Lebis to transfer to the corporation voting trust certificates purchased by her and income received thereon as a result of solicitation for bonds and stock by the corporation, as usurpation of a corporate opportunity. Defendants contend that she might be required to transfer certificates only if they were purchased by the corporation and received by her. While it may be that in some few instances where she eventually acquired certificates corporate funds or credit were used temporarily to finance the purchases of certificates, the purchases were intended to be made and were made by her, although the sellers undoubtedly assumed in almost all the cases that they were selling to the corporation. The corporation treated some certificates as "donated stock" and carried the transactions on its books as a purchase of bonds at the whole price paid, with the stock acquired as a gift, without cost to the corporation. These certificates were retained by the corporation and not sold to Mrs. Lebis. In other cases, where a separate price was set for the certificates, that amount was paid by Mrs. Lebis, to whom the transfer of the certificate was made by the transfer agent. The bonds were transferred to the corporation, which paid the agreed price therefor. A third class of purchases existed where a single price was set and paid by the bank as agent for the corporation for both bonds and stock, Mrs. Lebis thereafter paying $5 a share for the certificates, the corporation paying the balance of the agreed price for the bonds. Each purchase by Mrs. Lebis was a corporate opportunity in that the solicitation was authorized by the directors and made by the corporation. The stock acquired by the corporation at a single price expressed as for the bonds only was purchased by it, even though treated as donated. The purchases may have been in violation of statute, since made without formal vote of 75% of the shareholders. The purchases made were advantageous to the corporation, and no one here attacks them. Additional purchases at least to the amount acquired by Mrs. Lebis would also have been advantageous to the corporation and to its remaining voting trust certificate holders. An affirmative vote of 75% of the shares was possible if defendants desired. Yet the corporation could not legally so act unless they as shareholders chose to authorize it. The minority could not have forced the majority to so vote. It may well be doubted that this could be considered at this stage an existing corporate opportunity. In view of the impending refinancing requirements and the cash position of the corporation, the majority might well have refused in good faith to authorize corporate purchase of the additional certificates. That its actions were in good faith appears to be indicated by the treatment of the so-called "donated" stock, treated on the books of the corporation as a gift and retained in the corporate treasury. It might plausibly, and it would seem correctly have been treated as purchased stock. If so it might be so handled as to be acquired not for the corporation but for others, as was done with the non-donated stock, in view of the statutory prohibition. It would seem that the stock acquisition for Mrs. Lebis was made in a good faith belief that there was a corporate disability to acquire it or corporate disadvantage in so doing. In these circumstances, she is not accountable to the corporation except for the cost to it of its services in the acquisition, which was de minimis.

Judgment may be entered for the plaintiffs on the first count, ordering retransfer of the hotel and accounting in accordance herewith, and for the defendants on the second count. Form of judgment may be submitted on notice.

### Findings of Fact

1. The individual Plaintiffs, Irving Zauderer, Robert Linker, Lillian Linker,

Helen Kimmelman, Frances Zauderer and Anna Haberman, are residents and citizens of the State of New York.

2. The plaintiffs, Cathedral Estates, Inc. and Allenhurst Realties, Inc., are corporations organized under the laws of the State of New York and having their principal offices and places of business in the City, County and State of New York, and are residents and citizens of said State.

3. Charles Kimmelman and Milton Kimmelman, doing business as a partnership under the firm name and style of Charles and Milton Kimmelman, are residents and citizens of the State of New York and said partnership has its principal office and place of business in the City, County and State of New York.

4. The individual Defendants, Samuel L. Lebis and Ruth Lebis, are residents and citizens of the State of Connecticut and Samuel L. Lebis, William L. Hadden, and G. Harold Welch, as Voting Trustees of the stock of The Taft Realty Corporation, are residents and citizens of the State of Connecticut.

5. The Defendant Corporations, The Taft Realty Corporation and Hotel Taft, Inc. are corporations organized under the laws of the State of Connecticut and having their principal offices and places of business in the City of New Haven, County of New Haven and State of Connecticut.

6. This suit and every issue herein is wholly between citizens of different States and is not a collusive one to confer jurisdiction on a Court of the United States of an action of which it otherwise would not have jurisdiction, and the matter in controversy exceeds, exclusive of interest and cost, the sum of Three Thousand ($3,000) Dollars.

7. The Plaintiffs bring this action derivatively on behalf of The Taft Realty Corporation and on behalf of themselves and all other holders of Voting Trust Certificates of The Taft Realty Corporation similarly situated.

8. The Plaintiffs are now and were at the time of the transaction herein complained of holders of Voting Trust Certificates representing seven hundred twelve (712) shares of the common stock of The Taft Realty Corporation.

9. The Defendant, The Taft Realty Corporation, was organized pursuant to an Amended Plan of Reorganization of The Taft Realty Company in certain proceedings under former Section 77B of the Bankruptcy Act * dated June 5, 1936, and confirmed July 4, 1936, by the Hon. Carroll C. Hincks, District Judge of the District Court of the United States for the District of Connecticut.

10. Pursuant to said Amended Plan of Reorganization, all stock issued by Defendant, The Taft Realty Corporation, was issued to voting trustees under a voting trust agreement to be held in trust until September 1, 1951, or until all the new First Mortgage Bonds issued under said plan were paid, or called for redemption and payment thereof duly provided for. Pursuant to said Amended Plan of Reorganization, Voting Trust Certificates were issued to the bond holders of the debtor and to certain others in lieu of said stock.

11. Under said Amended Plan of Reorganization two parcels of real property in the City of New Haven, the first comprising premises hereinafter described as The Taft Hotel, and the second comprising premises described as the Annex, containing the Taft Apartments and the Shubert Theatre, were conveyed to The Taft Realty Corporation by the debtor, The Taft Realty Company.

12. Since the consummation of said Amended Plan of Reorganization in 1936, and prior to January 20, 1950, Defendant, The Taft Realty Corporation, maintained and operated the premises known as The Taft Hotel. The Taft Hotel, which is centrally located in the business district of New Haven at the southeast corner of Chapel and College Streets diagonally opposite the Yale Campus, is the principal hotel in New Haven. It contains the usu-

* Now 11 U.S.C.A. § 501 et seq.

al public rooms and lobby, stores on the ground floor and three hundred twenty-eight rooms of which approximately three hundred twenty-two are normally available for guests.

13. The Annex property contains the Shubert Theatre, three stores and approximately 110 rooms. It has been managed jointly with the hotel building proper, with which it is connected on the sleeping floors used for transient guests.

14. It obtains its water service and formerly obtained its power from the hotel proper. The laundry equipment for both buildings is in the basement of the Annex.

15. The Annex contains no public rooms or administrative facilities other than a small lobby with a small reception desk.

16. Samuel L. Lebis, William L. Hadden and G. Harold Welch are the voting trustees of the stock of the Defendant, The Taft Realty Corporation, and Samuel L. Lebis, William L. Hadden and one Louis Mintz are the directors of said Corporation.

17. On January 1, 1949 there were outstanding 28,201 shares represented by voting trust certificates of The Taft Realty Corporation. Of these, certificates for 1,173 shares were held by the corporation, 20,000 by Samuel L. Lebis, 2,159 by Ruth Lebis, 682 by the plaintiffs, and the balance, 4,187, by 177 other persons.

18. On July 1, 1949 there were outstanding 28,211 shares represented by voting trust certificates of The Taft Realty Corporation. Of these, certificates for 1,173 shares were held by the Corporation, 20,000 by Samuel L. Lebis, 3,198 by Ruth Lebis, 712 by the plaintiffs, and the balance, 3,128 by 171 other persons.

19. Samuel L. Lebis, by virtue of his ownership of a large part of the Voting Trust Certificates issued in lieu of the stock of The Taft Realty Corporation, at all times since in or about 1947 has controlled said Corporation, and the officers, directors and voting trustees of said Corporation are his nominees and are and have been under his direction and control, and Defendants, Samuel L. Lebis and Ruth Lebis, are, and were at the time of the transaction herein complained of, husband and wife.

20. Sometime in 1949 Samuel L. Lebis or his representatives organized The New Haven Realty Corporation, a corporation having a stated capital of Ten Thousand ($10,000) Dollars. In February, 1950 the name of said corporation, The New Haven Realty Corporation, was changed to Hotel Taft, Inc.

21. On January 20, 1950, the Defendants, Samuel L. Lebis, Ruth Lebis, and William L. Hadden, caused the Defendant, The Taft Realty Corporation, to convey to The New Haven Realty Corporation, now Hotel Taft, Inc., that parcel of real property comprising the premises known as The Taft Hotel together with furniture and equipment and other personal property employed in the operation of The Taft Hotel.

22. The circumstances surrounding the conveyances were in part as follows: The first mortgage bonds of The Taft Realty Corporation outstanding May 1, 1949, due September 1, 1951 totaled $763,800.

23. Of these, Samuel Lebis held $322,500. Between May 1 and August 1949 the corporation acquired $187,600 in first mortgage bonds, leaving $441,300 outstanding in the hands of the public. Lebis held all the outstanding second mortgage bonds, totaling $155,000.

24. The first mortgage bond indenture was amended November 28, 1949 to permit the calling of bonds by designation rather than by lot.

25. A first mortgage commitment of $500,000 on the hotel proper had been obtained early in 1949.

26. Mrs. Lebis borrowed $322,300 from two banks, purchased treasury bonds from the corporation, all outstanding first mortgage bonds were called in and redeemed.

27. The new corporation had been formed with a paid in capital of $10,000, its stock wholly owned by the Lebises.

28. The hotel proper was conveyed to the new corporation.

29. The old mortgages were released on the hotel proper, a new first mortgage for $500,000 placed thereon, $500,000 paid

over to the old corporation, and a purchase money instalment note and second mortgage for 23 years at 4% in the face amount of $315,000 executed to the old corporation by the new.

30. A series of unsecured notes was given to the old corporation by the new for the inventories and cash on hand of the hotel.

31. The old corporation utilized $322,-300 the major part of the $500,000 received from the first mortgagee to repurchase its bonds from Mrs. Lebis, enabling her to repay the money borrowed from the banks.

32. The following table shows the ownership interests, and the officers, including trustees, directors, counsel and managers of the selling and buying corporations:

| Seller | Buyer |
|---|---|
| The Taft Realty Corporation | Hotel Taft, Inc. |

| Ownership | Ownership |
|---|---|
| Samuel L. Lebis ⎫ Ruth Lebis ⎬ 92.4% | Samuel L. Lebis ⎫ Ruth Lebis ⎬ 100% |

**Officers**

**Officers**

Voting Trustees:
  Samuel L. Lebis
  William L. Hadden
  G. Harold Welch

Directors:
  Samuel L. Lebis
  Ruth Lebis
  William L. Hadden
  Louis Mintz
  Leon Kassell

Directors:
  Samuel L. Lebis
  Ruth Lebis
  William L. Hadden

Chairman of the Board:
  Samuel L. Lebis

President:
  Louis Mintz

President:
  Samuel L. Lebis

Vice President:
  William L. Hadden

Vice President:
  William L. Hadden

Treasurer:
  Samuel L. Lebis

Treasurer:
  Ruth Lebis

Secretary:
  Daniel Pouzzner

Secretary:
  Daniel Pouzzner

**Counsel**

**Counsel**

Pouzzner, Hadden, Kopkind & Hadden

Pouzzner, Hadden, Kopkind & Hadden

**Management**

**Management**

Lebis Hotel Management Corporation

Lebis Hotel Management Corporation

33. The stated consideration for said conveyance was Eight Hundred and Fifteen Thousand ($815,000) Dollars, of which Five Hundred Thousand ($500,000) Dollars had been borrowed by The New Haven Realty Corporation in return for a mortgage upon the premises conveyed, and of which the remaining Three Hundred and Fifteen Thousand ($315,000) Dollars took the form of a purchase money second mortgage note and mortgage on the premises conveyed, payable over a period of 23 years at 4% interest.

34. The fair market value of the property conveyed at the time of the conveyance was $815,000.

35. The fair market value of the second mortgage and note at the time of its receipt by the seller was $142,500.

36. The fair market value of the Annex remaining in the ownership of The Taft Realty Corporation was substantially lessened by the sale and conveyance of the hotel proper.

37. Plaintiffs made written demand on June 22, 1950, on Samuel L. Lebis and William L. Hadden, two of the Defendants Voting Trustees of the stock of The Taft Realty Corporation, and on June 27, 1950, on G. Harold Welch, the third Defendant Voting Trustee of said stock of said corporation, that suit be brought in the name of said Voting Trustees against the Defendants, The Taft Realty Corporation, Hotel Taft, Inc., Samuel L. Lebis and Ruth Lebis, for the relief herein sought.

38. Plaintiffs have not made any demand upon the present Board of Directors of The Taft Realty Corporation to bring action for the relief herein sought.

39. Defendant Samuel L. Lebis together with said William L. Hadden, constitute a majority of said Board of Directors and they are in control thereof.

40. From time to time from 1947 through 1950 the Directors of The Taft Realty Corporation, acting through and at the order and direction of Samuel L. Lebis, caused notices to be sent by and in behalf of the corporation over the corporate name to first mortgage bond holders of The Taft Realty Corporation inviting them to tender first mortgage bonds with voting trust certificates of The Taft Realty Corporation to the corporation so that it might purchase the same.

41. In certain instances, the defendant, Samuel Lebis, through the action of his agent and attorney, Daniel Pouzzner, who was also acting as agent and attorney for The Taft Realty Corporation and through action of others acting for him, acquired for his wife, the defendant Ruth Lebis, from first mortgage bond holders who were tendering certain first mortgage bonds to the corporation pursuant to said invitations for tenders made by the corporation, certain of said voting trust certificates.

42. A memorandum of decision is filed herewith and made a part hereof.

## Conclusions of Law

1. The Court has jurisdiction of the parties and subject matter of the action.

2. A controlling corporate majority has the burden of showing the entire fairness and corporate necessity of the sale of the major asset of the corporation to a new corporation wholly owned by the majority, when the transaction is questioned in a representative suit on behalf of the minority shareholders in the old corporation.

3. The controlling majority has failed to establish that the consideration received by the corporation on the sale of a hotel, its principal asset, was substantially equal to the market value of the hotel at the time of sale.

4. The controlling majority has failed to establish that sale to the new corporation was a necessity in the interests of the old corporation.

5. The old corporation is entitled to a judgment ordering reconveyance, and to an accounting of the profits realized by the new corporation from operation of the hotel.

6. The purchase of stock of a corporation, in need of extensive refinancing in

the near future, in the absence of a vote of 75% of its shareholders authorizing such purchase as required by state statute, may not be considered a corporate opportunity whose exercise by a majority shareholder for her own benefit required an accounting of her profits to the corporation.

### On Motion for New Trial, to Reopen Judgment and to Amend Findings and Judgment

Defendants by motion for new trial and other relief seek to reverse the findings and conclusions reached, or to adduce additional testimony concerning the issues of necessity of the sale, the amount of consideration paid, the right of plaintiffs to bring the action, the mortgage payments made after the sale, the effect on the value of the Annex of the sale, and other matters.

The issues to which these items are directed were plainly involved in the attack on the legality of the sale, and there was no lack of opportunity to present them in the long trial. No good reason appears to reopen the case after decision to permit further evidence available at the time of trial.

The findings may be amended by adding to paragraph 26 the words:

"prior to the consummation of the sale, except such bonds as were owned by Mr. or Mrs. Lebis."

An additional finding, paragraph 33 (a), is made, to read as follows:

"The sum of $500,000 was borrowed by The New Haven Realty Corporation in return for a first mortgage upon the premises conveyed in said amount, and the note in the amount of $315,000 was secured by a second mortgage on the premises conveyed."

In all other respects the motions are denied.

### On Motion for Judgment

Two items on the accounting are in dispute, credit claimed for federal and state income taxes and credit claimed for expenditures for legal services. The legal services were not for the benefit of The Taft Realty Corp., except those furnished in the refinancing of the first mortgage, which would have been required whether or not the illegal scheme had been adopted. They may be disallowed as credits in the accounting with the exception of $2500, which is found to be the reasonable value of legal services allocable to the first mortgage refinancing. The income tax payments are not allowable as credits on the accounting. The transfer of the principal asset of the old corporation to the new wholly owned corporation, to eliminate the minority shareholders from participation in the hotel business is not the type of innocent wrongdoing for which tax credits are allowed on an accounting of profits in equity. Cf. Bell & Co. v. Catalda Fine Arts, 2 Cir., 191 F.2d 99, 106. The old corporation will be faced with tax problems of its own on the recovery in the action. It should not be forced to undergo the risks of refund litigation to make available to it the funds from which its taxes for the years in question should have been paid but for the wrongful acts of the majority. Larson Jr., Co. v. William Wrigley Jr., Co., 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800.

Form of judgment in accordance herewith may be submitted on notice.